# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| CLARK/LEWIS a JV, | No. 85829-7-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| WASHINGTON STATE DEPARTMENT OF LABOR & INDUSTRIES, | |
| Appellant. | |

FELDMAN, J. — The Department of Labor & Industries (L&I) appeals from the superior court's order vacating the citations issued to Clark/Lewis by the Board of Industrial Insurance Appeals (Board) for several alleged violations of safety provisions of the Washington Administrative Code (WAC) enacted pursuant to the Washington Industrial Safety and Health Act of 1973 (WISHA), chapter 49.17 RCW. Upon review of the record, we affirm the Board's decision and, accordingly, reverse the superior court's order vacating the citations on judicial review.

I

Clark/Lewis, a joint venture between Clark Construction Group and Lease Crutcher Lewis, was the general contractor for the construction of the new addition to the Washington State Convention Center. On the evening of September 10, 2020, Tower Crane 2, operated by one of Clark/Lewis' subcontractors, collided

with the jib of a mobile crane. Both cranes sustained only minor damage. L&I investigated the crane collision. Following its investigation, L&I issued citations to Clark/Lewis for three violations of WISHA, two of which were classified as serious violations. The citation imposed a penalty of $2,100 for each of the two serious violations, with no penalty on the third violation.

Clark/Lewis challenged the citations, asserting that it did not commit any of the violations cited by L&I. The Industrial Appeals Judge upheld the citations as well as the assessed penalty amounts. Clark/Lewis appealed the citations to the Board, which affirmed all three citations and adopted the Industrial Appeals Judge's proposed decision and order as its own. Clark/Lewis appealed to the King County Superior Court. The superior court reversed the decision of the Board, determining that none of the citations was supported by substantial evidence. L&I appeals.

II

The Board concluded that Clark/Lewis violated WAC 296-155-53900(40), WAC 296-155-53401(5), and WAC 296-800-14005(1), each of which is quoted and discussed below. L&I asserts that substantial evidence supports the Board's conclusion that Clark/Lewis violated these provisions and that the superior court erred in determining otherwise. As to all three violations, we agree.

A.     Applicable Law and Standard of Review

L&I is charged with the authority to impose citations and penalties against employers for violating WISHA regulations. RCW 49.17.050, .120, .180. At the administrative level, L&I bears the initial burden of proving the existence of the

cited violations. WAC 263–12–115(2)(b); *SuperValu, Inc. v. Dep't of Labor & Indus.*, 158 Wn.2d 422, 433, 144 P.3d 1160 (2006). To establish a violation of a WISHA regulation, L&I must prove each of the following four elements:

> "(1) the cited standard applies; (2) the requirements of the standard were not met; (3) employees were exposed to, or had access to, the violative condition; [and] (4) the employer knew or, through the exercise of reasonable diligence, could have known of the violative condition."

*Id.*(alteration in original) (quoting *Wash. Cedar & Supply Co. v. Dep't of Labor & Indus.*, 119 Wn. App. 906, 914, 83 P.3d 1012 (2003)). For serious violations, L&I must additionally prove that "there is a substantial probability that death or serious physical harm could result." RCW 49.17.180(7); *see also Wash. Cedar & Supply Co.*, 119 Wn. App. at 917. The only element at issue here is the second element: whether L&I proved that the requirements of the standard were not met.

When reviewing a decision of the board, we do so based on the record before the agency. *Cent. Steel, Inc. v. Dep't of Labor & Indus.*, 20 Wn. App. 2d 11, 21, 498 P.3d 990 (2021). We "review findings of fact to determine whether they are supported by substantial evidence and, if so, whether the findings support the conclusions of law." *J.E. Dunn Nw., Inc. v. Dep't of Labor & Indus.*, 139 Wn. App. 35, 42-43, 156 P.3d 250 (2007) (citing *Inland Foundry Co. v. Dep't of Labor & Indus.*, 106 Wn. App. 333, 340, 24 P.3d 424 (2001)). Evidence is substantial if it is sufficient to convince a fair-minded person of the truth of the stated premise. *Cent. Steel*, 20 Wn. App. 2d at 22. We do not reweigh evidence but instead construe the evidence in the light most favorable to the party that prevailed in the administrative proceeding. *Id.* Here, that party is L&I.

- 3 -

B.    Violations of WISHA Regulations

1.    Violation of WAC 296-155-53900(40)

WAC 296-155-53900(40) states:

You must position tower cranes, in service, whereby they can slew 360 degrees without either the counterjib or jib/boom striking any building, structure, or other object, unless:

(a) Suitable anticollision devices are installed which will prohibit contact with such objects or;

(b) Direct voice communications are established between any operator of the tower crane(s) involved and a signal person so stationed where the boom and/or counterweight movement, and the object with which it may contact can be observed so that the operator(s) can be warned of imminent danger.

(i) You must establish a secondary means of positive communications as a back-up for possible direct voice communication failure.

(ii) Radio communication systems without tone coded squelch are prohibited. You must not use citizens band radios as a means of communications for tower cranes.

Clark/Lewis was cited for violation of this regulation on two bases: (1) that no signal person was "so stationed where the boom and/or counterweight movement, and the object with which it may contact can be observed," and (2) that it did not have a "secondary means of positive communications as a back-up for possible direct voice communication failure."

Aaron Simmons was the operator of Tower Crane 2 on the evening of September 10, 2020 and the only eyewitness to the collision to testify at the administrative hearing. Simmons testified that he was not given any signal to stop the tower crane before it collided with the mobile crane. When asked why no signal was given, Simmons testified as follows:

> A person that was directing me or acting as my signalman or bellman was about 35 feet from my tower and he was on a floor, I don't know, maybe Floor 10. Where the contact happened was 258 to 262 feet from where I was sitting in the cab. So I'm not sure that the signalman would even have been able to see it in the first place . . . from where he was at.

Simmons further testified that he believed that had a designated spotter been present for swing shift, this likely could have prevented the collision. This evidence is sufficient to support the Board's determination that Clark/Lewis did not have a signal person so stationed where the boom and/or counterweight movement and the object with which it may make contact can be observed.

Clark/Lewis asserts that it did not violate WAC 296-155-53900(40) because it had a signal person on site to observe the operation of Tower Crane 2. But WAC 296-155-53900(40) requires not merely that a signal person be present, but also that they be stationed so that they can observe the area where the Tower Crane could make contact with another object. Simmons' testimony establishes that his signal person was not so positioned.

Additionally, Clark/Lewis was required to have direct voice communications between the crane operator and the signal person, along with a secondary means of positive communication as back-up in the event of direct voice communication failure, as it did not have any anticollision devices in use on the cranes at its project site. Patrick Austin Sheely, the compliance safety and health officer who performed the inspection of Clark/Lewis' project site, testified that the Multi-Crane

Communication Plan (MCCP)[1] in place at the time of the collision was dated June 17, 2020. This version of the MCCP states:

> Each crane shall have at a minimum one radio for their crane's operations and one radio for crane to crane communications.
>
> To ensure that crane operations are not disrupted, personnel not involved in the current operation must request a "break" and be granted permission to speak before talking on a crane channel.
>
> Specific channels used may be modified to account for interference or other conditions.

The MCCP did not contain any provisions concerning the duties of signal persons, nor did it say anything further about communication between crane operators and signal persons. Simmons confirmed that the actual working conditions conformed to the MCCP, as "[e]very crane has two radios, one for the . . . crane-to-crane channel. And then the other radio would be for our bellmen or signalmen."

Clark/Lewis asserts that its secondary means of communication at the time of the collision was its radio channel shared by all crane operators at the site.[2] However, Clark/Lewis specifically prohibits anyone other than crane operators from using the crane-to-crane radio channel. As such, the crane-to-crane channel could not have operated as a backup in the event that the signal person's radio channel failed.

_____

[1] An MCCP is "a plan that describes the interaction between multiple cranes on a single site and sets forth protocols on who is allowed to operate their cranes in what space freely, what's the protocol for moving into another crane's space, and what do you do at the end of shift to put your crane in a position so that other operations can continue or the tower cranes can weathervane, which means swing freely in the wind throughout the course of the night when the cranes are not in use."

[2] Although the August 15, 2020 MCCP contains a provision outlining the duties of spotters and calls for spotters to carry air horns as a secondary means of communication in the event of radio failure, this version of the MCCP was not published and distributed until after the collision.

Accordingly, the Board's finding that Clark/Lewis did not have an appropriately stationed signal person and did not have a secondary means of communication between signal persons and crane operators, in violation of WAC 296-155-53900(40), is supported by substantial evidence.

2.  Violation of WAC 296-155-53401(5)

WAC 296-155-53401(5) states, in relevant part, "The site supervisor's duties would include the following: . . . (c) Ensuring that a qualified person is designated as the lift director.  (d) Ensuring that crane operations are coordinated with other job site activities that will be affected by or will affect lift operations." WAC 296-155-53401(1) defines a "lift director" as a person who "[d]irectly oversees the work being performed by a crane and the associated rigging crew."

Several witnesses described what it means for a lift director to be "qualified."[3]  Sheely testified that L&I determines whether a lift director is qualified by assessing their "basic experience and knowledge of cranes and how cranes operate and crane hazards, and then their understanding and knowledge of both of the requirements of a lift director and their understanding and knowledge of their responsibility to fulfill those requirements."  Mark Valgardson, a statewide crane consultant with L&I, similarly testified that a qualified lift director is someone who possesses knowledge, training, and experience in "rigging, load movement, the crane movement, the choreography of the lift, and the conditions around the crane."

---

[3] Neither WISHA nor the administrative code define "qualified" in this context.

According to the testimony of Aaron Simmons, the operator of Tower Crane 2, the swing shift "never had any lift directors" and he was not aware of anyone serving in that capacity on September 10, 2020. Simmons also did not know the name of the person who was acting as his signal person on September 10, 2020. Simmons further testified that no one person was specifically assigned to act as his signal person; "[t]here was just different people all the time."

David Barone, an employee of subcontractor American Bridge, was acting as the lift director responsible for Tower Crane 2 at the time of the collision. Barone did not usually serve in this capacity for the swing shift. Sheely testified that he spoke to Barone and surmised he was not qualified to serve as a lift director.[4] Clark/Lewis argues that the only basis Sheely provided for this conclusion was his observation that Barone was from out of state. Although Sheely considered Barone's out of state residence to be a "red flag," Sheely *also* testified that Barone did not have "any awareness of what his duties as a lift director were or, critically, that he had any awareness at all of his responsibility to fulfill those duties or stop crane operations if things were not correct."

In addition to Barone's lack of understanding of his duties, other evidence further supports the Board's finding that Clark/Lewis was not ensuring that a qualified person was designated as the lift director, particularly for the swing shift. Upon speaking to multiple employees at the project site, Sheely concluded that it had not been made clear who the designated lift directors were on the evening of

---

[4] Clark/Lewis argues that Sheely's testimony constituted "inadmissible opinion testimony . . . based on inadmissible hearsay." Although Clark/Lewis objected to some of Sheely's testimony on the basis of hearsay, the Industrial Appeals Judge admitted the testimony for non-hearsay purposes. Clark/Lewis did not challenge any evidentiary rulings in its appeal to the superior court.

September 10, as he "received several different answers from everyone I interviewed." Sheely's determination was corroborated by Simmons, who testified that "I was concerned that on night shift I didn't have bellmen or signalmen assigned specifically to my crane; I just kind of got a random guy from random different trades. And that's not usual for me."

Greg Groleau, vice president of Clark Construction, testified that although Clark/Lewis required its subcontractors to "provide us a list of the names who were acting as their lift directors," it would only interview those individuals "in some cases" as it was "really incumbent upon the contractor to determine the qualifications for their people." In congruence with Groleau's testimony, the MCCP in effect at the time of the collision stated that "[a]ny company having a crane on site will be required to appoint a Lift Director (or Directors) for their activities. The Lift Director is responsible for all crane activity conducted by that company and must be present during crane operations." According to Sheely, this was improper because "[t]he Code specifically calls out that the site-wide supervisor is responsible for designating the lift director. And so delegating the designation or appointment of a lift director to the subcontractors is not allowed." Additionally, Sheely testified that "the [MCCP] doesn't specifically call out lift directors as their duty to ensure that site operations are – all hazards on-site are addressed before the crane is allowed to operate." Even if the MCCP did address the duty of lift

directors, Barone, the lift director on September 10, was not provided a copy of the MCCP until that very day.[5]

All of this evidence, viewed in the light most favorable to L&I, supports the Board's finding that Clark/Lewis did not ensure that a qualified person was designated as the lift director. The Board's findings, in turn, amply support its conclusion that Clark/Lewis violated WAC 296-155-53401(5).

3.    Violation of WAC 296-800-14005(1)

WAC 296-800-14005(1) states, "You must develop a formal accident prevention program that is outlined in writing. The program must be tailored to the needs of your particular workplace or operation and to the types of hazards involved." The Board determined that Clark/Lewis violated this regulation because its accident prevention program and MCCP "do not address the safety and supervisor structure in a multicrane situation." L&I explained that these documents omitted critical information, including "the duties of the lift director, how Clark/Lewis will ensure the lift director is qualified, the requirement for a superintendent to be present on every job, or the requirement for spotters or signal people to be aware of crane activities and assist in preventing crane collisions."

Clark/Lewis' core accident prevention program was a generalized document that was not tailored to any particular project site. This core document did not contain any "recognition of the hazard that multi-crane situations present." The MCCP, which *was* specifically tailored to the convention center project, was

---

[5] Simmons similarly testified that the only times he received Clark/Lewis' MCCP was during his orientation and on September 11, 2020 – the day after the collision.

considered part of the accident prevention program for purposes of the regulation. As discussed *supra*, the MCCP in effect at the time of the collision did not call for a back-up means of communication between signal persons and crane operators and was thus deficient for a multi-crane project site. The MCCP also did not address the duties of lift directors or signal persons. As Sheely testified, the responsibilities of a lift director are something that he would expect to be in the core portion of the accident prevention program and, if not there, they would be in the MCCP. However, Sheely also testified that neither Clark/Lewis' core accident prevention program nor its MCCP contained provisions "outlining who has the responsibilities for what training or experience [lift directors] need to have in order to be able to appropriately supervise and enforce safety policy."

Clark/Lewis asserts that the Board should have found that its accident prevention program was sufficiently tailored to its project because it presented evidence that it provided copies of WISHA regulations to its subcontractors and regularly sought advice from Valgardson about what should be included in their MCCP. The Board's order reflects that it considered this evidence but concluded that the citation was nevertheless warranted. We do not reassess the weight that the Board gave to the evidence presented. *Cent. Steel*, 20 Wn. App. 2d at 22. Viewed in the light most favorable to L&I, the evidence supports the Board's determination that Clark/Lewis' accident prevention program was not tailored to the hazards of the convention center project.

III

Substantial evidence supports the Board's determination that Clark/Lewis committed serious violations of WAC 296-155-53900(40) and 296-155-53401(5), and committed a general violation of WAC 296-800-14005(1). We affirm the Board's decision and, accordingly, reverse the superior court's order vacating the citations on judicial review.

Feldman, J.

WE CONCUR:

Smith, C.J.                          Mann, J.